79 Wyo. 124 (1958)
331 P.2d 836
In the matter of the claim of Lillian Richard, Lusk, Wyoming, wife of deceased,
C.B. Richard, and James E. Barrett, Guardian ad litem of Clyde Brent Richard, Jr., and Barbara Mary Richard, minor children of deceased,
C.B. Richard, Appellants (Employee-Claimants below)
vs.
George Noland Drilling Company, incorporated, 823 South Detroit Avenue, Tulsa 20, Oklahoma Appellee (Employer-Defendant below)
No. 2841
Supreme Court of Wyoming
November 12, 1958
For the appellants the cause was submitted upon the brief of Robert R. Rose, Jr., and Arthur F. Fisher of Casper, Wyoming, and oral argument by Mr. Rose.
For the appellee the cause was submitted upon the brief and also oral argument of Gerald A. Stack of Thermopolis, Wyoming.
Heard before Blume, C.J., and Harnsberger and Parker, JJ.

*125 OPINION
Mr. Justice Parker delivered the opinion of the court.
Claims were filed under the Wyoming Workmen's Compensation Law by Lillian Richard, widow of C.B. Richard, and by James E. Barrett, guardian ad litem of Clyde Brent Richard, Jr., and Barbara Mary Richard, minor heirs of deceased. Death occurred because of asphyxiation during a time when Richard was lying near a butane stove in the lower doghouse at employer's oil well drilling rig, known as Roth No. 2. The matters were tried as one case, and the court denied relief, finding against claimants and concluding as matters of law that:
(1) Decedent in entering upon employer's premises was in an intoxicated condition and was guilty of a gross misdemeanor constituting culpable negligence precluding recovery, and
*129 (2) Deceased had abandoned his employment so that the injury was not a result thereof.
Appellants here urge that the judgment and decree was contrary to the evidence and the law in its holding that (a) employee's death was not a result of his employment and (b) employee's death was due solely to his own culpable negligence.
In a consideration of the correctness of appellants' contentions, it is necessary to determine whether or not deceased at the time of his death and immediately prior thereto was engaged in his employment as a driller's helper or roughneck of the appellee, and if he was, whether or not his injury and resulting death was due solely to his own culpable negligence.
The essential facts disclosed by the record are as follows: Prior to February 18, 1957, the deceased, C.B. Richard, had been employed as a driller's helper or roughneck by the George Noland Drilling Company, Inc., at Roth No. 2, about thirty-eight miles from Lusk, Wyoming, and was working the morning tower (12 midnight to 8 a.m.). The employees furnished their own transportation from their living quarters at Lusk to Roth No. 2 and return; it was customary for them to travel by car pool. On the night of February 18, the four members of the morning-tower crew, L.D. Cates, (roughneck), Floyd Bartos (driller), Pete Owens, and C.B. Richard, traveled from Lusk to Roth No. 2 in Cates' automobile. Owens was driving the car and Cates riding in the front seat. They picked up Richard at the Silver Dollar Bar in Lusk about 10:20 p.m. and drove on to Keeline where Bartos joined them.
*130 It is undisputed that Richard had been drinking prior to the time he was picked up at the bar by the other members of the car pool, but the record indicates a difference of opinion as to his condition. Cates said that Richard was sober when he came out to get in the car but admitted on cross-examination that he, Cates, and deceased had had about a dozen drinks of beer prior to 4:30 on the afternoon of the 18th. Bartos said that when he entered the automobile Cates was "throwing his arms around, on me and Pete Owens" and was intoxicated. Coffey, an oil operator, said he saw Richard in the bar at Lusk about 10:30 on the evening of the 18th and "He was staggering and he walked to the counter and leaned against the counter and wobbled around and asked for 2 quarts of buttermilk. The waitress misunderstood him and he tried 2 or 3 times to tell her. * * * He was not standing erect. * * * I would say he was intoxicated." Stafford, a geologist, said he saw Richard in the bar in Lusk between 10 and 10:30 p.m. on the 18th, staggering and leaning against the table; described his actions in fumbling with the door and finally getting it opened; and said that Richard was intoxicated.
In any event the evidence is uncontradicted that Richard upon leaving the bar got into the back seat of the car and went to sleep. The night was cold, something below zero and windy. When the car arrived at the well, Bartos went to the upper doghouse and changed clothes, Owens to the lower doghouse; thereafter, both Bartos and Owens "went to work." Cates and Richard stayed in the car about thirty minutes and when it got cold went to the lower doghouse. Cates testified that thereafter he went to the top doghouse and talked to Owens who told him, "Go on down and change your clothes and we'll call you when we need you," and that when he relayed this information Richard *131 said, "Well, I'm going to get me a little nap then," put some clothes down, and lay on the floor with his head about a foot away from the stove. Bartos testified that approximately two hours after he went to work Owens reported sick men in the lower doghouse, that he went down and found Cates and Richard lying on the floor, carried them outside, and started giving them artificial respiration. Cates later revived and Richard died.
We first review the evidence for answer to the pivotal question, Was Richard engaged in his employment as a driller's helper or roughneck of the appellee at the time he became asphyxiated? Several important facts are uncontroverted:
(1) Richard with the other employees usually, and on the night in question, came to work by car-pool arrangement and was not transported by the employer.
(2) On the night in question he had been drinking, was picked up at a bar, and slept all the way to Roth No. 2.
(3) He was sleeping when he arrived and remained in the car some thirty minutes.
(4) He then left the car with Cates and went to employer's lower doghouse, which was an area utilized by the employer as a place for storage of equipment and by the roughnecks as a place for changing clothes. The room was heated by butane gas.
(5) He stated that he intended to take a nap, and lay down on some clothes near the fire.
*132 Cates testified that he had reported to Owens, intimating that Owens in effect relieved him and Richard from working until called. Owens did not testify at the trial although he was apparently present and was paid mileage and witness fees. Bartos, the driller in charge of operations during the morning tower, testified that Cates did not come to the floor of the rig and that he sent Owens out with an order for Cates and Richard to change clothes and come to work. In any event, it is clear that the deceased did not report to the driller or to anyone else at the well but merely stayed in the car until he was cold, then went into the lower doghouse, took down some clothes, and lay down on the floor before the fire.
The trial court made a finding of fact:
"* * * That after entering upon the premises as aforesaid, the decedent did not go to the place where he should have gone in pursuance of his employment, nor did he equip himself, by changing clothes or otherwise, to continue his efforts in behalf of Employer-Defendant, or to engage in the labors for which he was employed";
and conclusions of law:
"* * * (1) That the action of the decedent in entering upon the premises while under the influence of intoxicating liquor constituted a gross misdemeanor under the laws of the State of Wyoming, and was of such grave character as to constitute culpable negligence which negligence was the sole cause of the death, and that thus recovery under the Workmen's Compensation Act [W.C.S. 1945, § 72-101, et seq. (1957 Cum. Pocket Supp.)] and the laws of The State of Wyoming is precluded. (2) That the actions of the decedent after entering upon the premises where he was employed (that is in failing to equip himself for work, failing to go to the place where he was employed, and in his *133 actions with regard to sleeping) were such as to constitute abandonment of employment, thus the injury complained of was not the result of the employment of the decedent. * * *"
Appellants argue that under the evidence Richard had his employer's permission through its agent, Bartos, to be resting in the lower doghouse and was therefore within the scope of his employment. Inasmuch as there is no claim of direct permission from Bartos, the argument is apparently based upon the following testimony:
(1) Owens' purported statement to Cates, "Go on down and change your clothes and we'll call you when we need you."
(2) Bartos' admission that roughnecks used the lower doghouse of an oil company to rest and recline during working hours and that this employer did have a doghouse for the purpose of allowing roughnecks and drillers to rest and eat lunch.
(3) Cates' statements that if there was a lull in drilling operations it was customary to go to the doghouse and wait calls and that in the early morning hours the roughnecks were at ease.
Considering the points in the order mentioned, we look to the record to ascertain whether or not Owens had any authority to give permission to the workers. We find none. We turn then to the testimony regarding the customs of oil companies, this one in particular, and oil workers with relation to the use of the lower doghouse. In doing so we adhere to the rule that where evidence is conflicting we are permitted only to consider that which is favorable to the successful party. Rayburne v. Queen, Wyo., 326 P.2d 1108, *134 1111, and cases cited. The following evidence bears on the subject:
Wayne Sullivan, the tool pusher or foreman of Roth No. 2, stated that the lower doghouse had two purposes: The roughnecks used it for a change house, and the company used it as a parts house. He said that he had given all drillers instructions that there was to be no sleeping on the tower at any time and that Richard was present at that time although working on the rig. He reiterated that the lower doghouse was not a place for members of the crew to rest but was to be used for changing clothes; and when asked if it was not a custom that men working for an oil company loaf during their nonactive hours on the rig, he answered, "If they don't get caught. * * * Ordinarily they are fired."
Bartos testified that as soon as he arrived he and Owens went to work on the floor of the rig; started the brake and proceeded with the drilling some twenty to twenty-five minutes; made a connection, i.e., picked up another "joint pipe" and ran it into the hole; started drilling again and continued for about thirty minutes or an hour. He said neither Cates nor Richard left the car when he and Owens did; Richard did not come to the floor of the rig; he did not see Cates there; and he sent Owens out with the order for Cates and Richard to change clothes and come to work.
Considering as we must that the trial court viewed the testimony in the light most favorable to defendant, it would appear that although drillers' helpers occasionally used the lower doghouse for resting this was contrary to company policy, known to the drillers; that the first part of the morning tower on the day in question was not a rest period but one during which *135 the driller's helpers were needed. Accordingly, there is no merit in counsel's contention that Richard had the employer's permission to be lying on the floor of the doghouse and that he was within the scope of his employment while so doing. The evidence is uncontradicted that Richard did nothing beneficial to his employer at any time after he appeared at the scene. The court found that he had abandoned his employment, and we think there was sufficient evidence to support this finding. Courts have been liberal in holding workmen to be entitled to compensation, but no case has been cited which goes as far as we are asked to go here.
Plaintiffs urge that Richard's sleeping was at most a violation of a rule relating to his conduct within the scope of his employment. A review of authorities indicates such a variety of circumstances under which persons sleep on the job that it is difficult to formulate a general rule. However, under certain situations intentional sleeping has been held to constitute abandonment. See 1 Larson, Workmen's Compensation Law, 1952, § 21.71; 58 Am.Jur. Workmen's Compensation § 228, p. 736; Annotations, 10 A.L.R. 1488, 55 A.L.R. 981. In the present case the evidence favorable to the defendant does not show Richard to have died as a result of his employment and while at work in or about the premises occupied so as to be within the provisions of our Law, § 72-104, W.C.S. 1945 (1957 Cum. Pocket Supp.). On the contrary, the evidence was sufficient to warrant the finding and judgment, and the matter may not be disturbed on appeal. Woolsulate, Inc., v. Fremont Lumber Co., 75 Wyo. 492, 297 P.2d 818. See also Arnold v. Jennings, 75 Wyo. 463, 296 P.2d 989; State v. Faulkner, 75 Wyo. 104, 292 P.2d 1045.
Since the trial court concluded that the injury was not the result of decedent's employment and was justified *136 in so doing, it becomes unnecessary to consider the matter of intoxication except to note in passing that a claimant in an advanced state of intoxication may abandon his employment by making himself incapable of engaging in his duties. See 1 Larson, Workmen's Compensation Law, 1952, § 34.20; 6 Schneider, Workmen's Compensation Text, 1948, § 1586. See also 58 Am.Jur. Workmen's Compensation § 207; 99 C.J.S. Workmen's Compensation § 247.
Affirmed.